**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

Richard Anthony,

        *Plaintiff,*

    v.

John Halloran; Kenneth Boudreau; Michael Clancy; Geri Lynn Yanow, as Independent Administrator of the Estate of William Foley; Paul Sabin; City of Chicago, Cook County State's Attorney's Office, Cook County, and other as yet unidentified individuals,

        *Defendants.*

Jury Trial Demanded

**COMPLAINT**

Plaintiff, Richard Anthony, through his attorneys, Hughes Socol Piers Resnick & Dym, Ltd., and complaining of Defendants John Halloran; Kenneth Boudreau; Geri Lynn Yanow, as Independent Administrator of the Estate of William Foley; Michael Clancy; Paul Sabin; City of Chicago; Cook County State's Attorney's Office; Cook County, and other as yet unidentified individuals, alleges as follows:

**Introduction**

1. Plaintiff Richard Anthony is an innocent man who spent twenty years incarcerated for a crime he did not commit.

2. In 1993, Plaintiff was coerced into giving a false confession during a corrupt investigation led by some of the most notorious detectives in Chicago Police Department history.

3. In the decades since Plaintiff's conviction, he has always maintained his innocence. In 2025, his conviction was vacated and the State dismissed all charges against Plaintiff. With this case, Plaintiff seeks to hold accountable the parties responsible for his wrongful conviction.

**Jurisdiction and Venue**

4.      This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law.

5.      This Court has jurisdiction over Plaintiff's § 1983 claims pursuant to 28 U.S.C § 1331 and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C § 1367.

6.      Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this judicial district.

**Parties**

7.      Plaintiff Richard Anthony is a 53-year old Chicago resident who spent 20 years in prison for a crime he did not commit.

8.      At all times relevant to this complaint, John Halloran, Kenneth Boudreau, William Foley, and Michael Clancy (hereinafter "Defendant Officers") were Chicago Police Department detectives acting under the color of law and within the scope of their employment for the City of Chicago. William Foley is deceased. In 2018, Foley's probate estate was re-opened in the Circuit Court of Cook County, with Geri Lynn Yanow named as Independent Administrator of the Estate of William Foley.

9.      Defendant City of Chicago is an Illinois municipal corporation that employed each of the Defendant Officers and maintained policies and customs that were the moving force behind the Defendant Officers' misconduct.

10.      At all times relevant to this complaint, Paul Sabin was an assistant state's attorney acting under the color of law and within the scope of his employment for Cook County and the Cook County State's Attorney Office.

11.      Defendants Cook County and the Cook County State's Attorney Office employed Assistant State's Attorney Sabin.

**The Crime**

12.     On February 8, 1993, several masked men entered the home of Arlesia Davis near 57th and May Streets in Chicago and killed her. While inside the home, the men also shot Ms. Davis's adult daughter in the hand and stabbed Ms. Davis's brother and shot him in the leg.

**A Task Force Is Assembled To Clear Three Homicides**

13.     The Chicago Police Department assigned a task force to clear the Davis homicide along with two other homicides: Walter Rule, who was shot on February 9, 1993 near a payphone at 1859 West 53rd Street, and Jeffrey Rodgers, who was shot on February 10, 1993 at a beauty salon near 55th and Racine Streets.

14.     Each of the Defendant Officers was a detective on the task force.

15.     The task force's strategy for solving these homicides was to round up young men and boys from the neighborhood, bring them to Area 1, and coerce them into making false inculpatory statements.

16.     The task force was assisted by a team of Cook County Assistant State's Attorneys (ASAs) from the office's Felony Review Unit. Unlike trial prosecutors, the felony review ASAs worked in an investigative capacity, assisting task force detectives by obtaining statements from the boys and young men detectives brought to Area 1.

17.     At the time, the Cook County State's Attorney's Office (CCSAO) staffed the Felony Review Unit with junior attorneys who saw the assignment as a stepping stone to desirable positions in the CCSAO felony trial division. Felony Review was a "make or break" assignment, where ASAs were encouraged to be team players with Area 1 detectives.

Page 3 of 30

18. The Defendant Officers and Defendant Sabin were active participants in the task force, and, on in formation and belief, all shared the objective of solving all three homicides in the manner described above.

## Task Force Members Bring Plaintiff to Area 1

19. Consistent with this strategy, on February 21, 1993, the Defendant Officers brought Plaintiff to Area 1, placed him in a small windowless interview room, and began interrogating him about the homicides.

20. The task force focused on solving the crimes in reverse chronological order, with primary focus on the Rogers homicide.

21. By the time Defendants brought Plaintiff to Area 1, task force members and other felony review ASAs had nearly "solved" the Rogers and Rule homicides by extracting false confessions from other neighborhood youth, but they needed at least one additional statement to "solve" the Davis homicide.

22. Prior to that date, Plaintiff had never been arrested, nor interrogated about a crime. He had no criminal history whatsoever.

23. At the time, Plaintiff was a 20-year-old young man working as a barber. He had recently graduated from Lindblom Technical High School and he lived with his family in the same home where he grew up, which happened to be a few blocks away from the Davis family home.

24. Plaintiff had no involvement whatsoever in the Davis homicide or any of the homicides.

25. Over the next 36 hours, Defendants conspired and worked together to fabricate evidence and extract an inculpatory statement from Plaintiff that would allow the task force to "solve" the Davis homicide and close all three cases.

26. There was no point prior to or during Defendants' 36-hour encounter with Plaintiff that probable cause existed to believe Plaintiff committed any crime.

**Plaintiff's Fabricated and Coerced "Confession"**

27. Approximately 36 hours after Plaintiff arrived at Area 1, he signed a false confession that he had acted as a lookout for the Davis homicide.

28. Throughout Plaintiff's 36 hours in custody, Defendants worked together to manipulate him through the application of psychological and physical abuse.

29. During this time, detectives held Plaintiff incomunicado in a small windowless interrogation room at Area 1. Several of Plaintiff's family members went to Area 1 to check on him, but Defendants did not allow Plaintiff to communicate with them.

30. Over the 36-hour period, Plaintiff was provided only one meal, was denied access to the bathroom, and had no opportunity to sleep.

31. Over the 36-hour period, different sets of Defendant Officers took turns questioning Plaintiff, but their objective was the same: to fabricate evidence that would allow them to close the cases.

32. As the interrogation sessions continued, Defendants Halloran and Boudreau took over as lead interrogators, working together as partners to escalate the pressure tactics on Plaintiff.

33. They told Plaintiff they knew he participated in the Davis homicide and he needed to confess. Plaintiff repeatedly denied Defendants' accusations.

34. After being accused of murder, Plaintiff asked for permission to call his mother and he said that he wanted to leave Area 1, but Defendants would not allow him to do either.

35.     Instead, Halloran told Plaintiff that if he was ready to leave, he needed to admit that he acted as a "lookout" to the Davis homicide. When Plaintiff denied his involvement, Halloran responded, "well then you must not be ready to leave," or words to that effect

36.     Eventually, Halloran began feeding Plaintiff "facts" about Plaintiff's purported role as a lookout during the offense and stating that Plaintiff could leave after he repeated those facts to Defendant Sabin.

37.     When Plaintiff resisted, Halloran subjected him to physical abuse and threats. Halloran slapped Plaintiff's face, put Plaintiff in handcuffs, and stepped on Plaintiff's shoeless feet. Halloran also told Plaintiff that prosecutors would "hang his fat ass" for murder if he didn't cooperate.

38.     Eventually, Plaintiff met with Sabin and was presented with a pre-written confession about having supposedly been a "look out" for the Davis homicide.

39.     The pre-written confession was false. Plaintiff did not make the inculpatory statements attributed to him in the pre-written confession, nor did he committ any of the acts attributed to him in the pre-written confession. The pre-written confession also contained false statements about Plaintiff having been treated well by the Defendant Officers.

40.     On information and belief, the pre-written statement was drafted by Sabin with input from Halloran, both of whom knew that the contents were false.

41.     Plaintiff told Sabin he had no involvement in the Davis homicide and that the pre-written confession was not true.

42.     Sabin ignored Plaintiff's protestations of innocence, stating that if Plaintiff was ready to leave he needed to sign the statement. By ignoring Plaintiff, Sabin conveyed that Plaintiff had no choice but to capitulate and adopt the false statement presented to him.

43.     Shortly after midnight on February 23, 1993, in the presence of both Halloran and Sabin, Plaintiff's will was overborne and he signed the statement.

44.     Even though the statement was not true, Plaintiff signed it because he was mentally and physically exhausted, his will was overborne, and saw no alternative to leaving custody.

### Fabricated Oral Confession

45.     Defendants Foley and Clancy fabricated additional evidence against Plaintiff.

46.     Specifically, Foley and Clancy falsely reported to others that Plaintiff made an oral confession to them at 3:30am on February 22, 1993.

47.     Plaintiff never made an oral confession to Foley or Clancy.

48.     Foley and Clancy's report that Plaintiff supposedly orally confessed to them was completely made up.

49.     Foley and Clancy further fabricated evidence of Plaintiff's supposed oral confession by documenting it in police reports and repeating it to prosecutors.

### Criminal Prosecution And Exoneration

50.     Based on the above-mentioned fabricated evidence and involuntary statement, Defendants caused criminal charges to be initiated against Plaintiff.

51.     At no point was there probable cause to arrest, charge, or prosecute Plaintiff for any crime connected to the Davis homicide.

52.     In April 1993, a grand jury returned an indictment against Plaintiff, charging him on accountability theory with murder, attempted murder, home invasion, and aggravated battery with a handgun.

53.     On information and belief, the State relied on fabricated evidence of Plaintiff's supposed oral confession as well as Plaintiff's involuntary handwritten statement to obtain the indictment.

54.     On November 28, 1994, a jury trial commenced against Plaintiff.

55.     The State's case against Plaintiff rested entirely on the fabricated evidence of his Plainitff's supposed oral confession and Plaintiff's involuntary handwritten statement. The State presented no physical evidence nor eyewitness testimony linking Plaintiff to the crime.

56.     Plaintiff testified in his own defense, denying his involvement in the crime, denying that he made any oral confession, describing the detectives' abuses, and explaining that he signed the handwritten statement only because his will was overborne. Plaintiff also presented testimony from alibi witnesses who were with him when the crime occurred.

57.     In rebuttal, the State called Defendant Halloran, who denied that Plaintiff had been abused.

58.     In closing, the State urged the jury to credit detectives' accounts over Plaintiff's, going so far as to argue that if Plaintiff's account was true, then Defendant Halloran would be criminally prosecuted.

59.     On December 2, 1994, the jury returned a verdict finding Plaintiff guilty of home invasion and aggravated battery with a firearm and not guilty of murder and attempted murder.

60.     Without Plaintiff's involuntary statement and without Foley and Clancy's fabricated reports, Plainitff never would have been detained, charged, or convicted.

61.     On January 5, 1995, Plaintiff was sentenced to 40 years in prison.

**Plaintiff's Exoneration**

62.     Following Plaintiff's conviction, evidence emerged to show that Defendants Halloran, Boudreau, Foley, and Clancy engaged in a pattern of similar investigative misconduct, abusing young Black men and boys as they had done with Plaintiff.

63.     For example, not long after interrogating Plaintiff, Boudreau and Foley used similar tactics to "solve" an Englewood cold case, this time by interrogating and fabricating statements from Jerry Fincher, Harold Richardson, Vincent Thames, Michael Saunders, and Terrill Swift.

64.     While the Fincher statement was suppressed, the other individuals (the "Englewood Four") were wrongfully convicted and served significant sentences before being exonerated in 2012, after DNA evidence revealed the true perpetrator and proved unequivocally the confessions were false.

65.     After the Englewood Four were exonerated, the FBI discovered an insider's account of how those false confessions were obtained. Former felony review ASA Terrence Johnson revealed that detectives told the Englewood Four they could go home if they cooperated by confessing to the crime and implicating others. They were told "witnesses go home." Johnson further reported that the detectives created a "cheat sheet" to help them detectives and felony review ASAs keep their stories straight when testifying at the subsequent motions brought by the Englewood Four. Johnson also described the pressure Area 1 felony review ASAs felt to be team players with Area 1 detectives.

66.     In the aftermath of these revelations, the Cook County State's Attorney decided to undertake a systemic review of criminal convictions involving confessions taken by certain Area 1 dectives involved in the Engelwood Four case, including defendants Foley and Boudreau.

67.     Many of the convictions in need of review involved confessions taken in the 1990s by felony review ASAs who remained employed for years by CCSAO, some of whom had risen to positions of leadership and prominence in the Office.

68.     To facilitate unbaised review, the State's Attorney designated a Working Group of three Special Assistant State's Attorneys ("Special ASAs"), who had not previously worked for CCSAO. The Special ASAs were tasked with conducting an independent review of convictions and making a recommendation directly to the State's Attorney about whether each conviction should be vacated in the interest of justice.

69.     To ensure transparency, CCSAO pledged that the Special ASA's recommendations to the State would be made public.

70.     The Special ASA's undertook a review of Plaintiff's conviction.

71.     After conducting an exhaustive and thorough review of all facts and circumstances surrounding Plaintiff's conviction, the Special ASA's recommended to the State's Attorney that Plaintiff's conviction should be vacated in the interest of justice.

72.     In support of this recommendation, the Special ASA's found that detectives engaged in abuse and coercive conduct relating to Plaintiff's statement.

73.     The Special ASAs also credited Plaintiff's claim of actual innocence, highlighting testimony from Plaintiff's alibi witnesses, the failure of eyewitnesses to the crime to identify Plaintiff as one of the perpetrators, and evidence pointing to other perpetrators.

74.     Subsequently, with support from the State, Plaintiff filed a petition to vacate his conviction, and on February 24, 2025, the Circuit Court of Cook County granted the petition. On July 23, 2025, the State dismissed all charges against Plaintiff.

**Detectives' Pattern of Misconduct**

75.     As noted above, Between Plaintiff's trial and today, evidence has emerged to show that the detectives who cased Plaintiff's wrongful conviction (primarily Defendants Halloran, Boudreau, Foley, and Clancy) engaged in a long pattern of similar investigative misconduct, none of which was presented at Plaintiff's criminal trial. To provide just a few examples:

76.     In February 1992, Arnold Day was arrested and interrogated by Defendants Foley, and Boudreau in connection with a murder investigation. During the interrogation, Foley choked Day while Boudreau watched. Day falsely confessed to the murder of Jerrod Erving several hours after his arrest. Decades later, Illinois Torture Inquiry Relief Commission found credible evidence that Day was tortured to merit judicial review and referred the case to circuit court. The State subsequently dismissed charges against Day, and Day was granted a Certificate of Innocence.

77.     In October 1992, Detectives Halloran and Boudreau obtained an involuntary confession from Clayborn Smith wherein he admitted to the murder of Miller Timms and Ruby Bivens. Smith alleged that Halloran and Boudreau locked him in a small interrogation room, physically abused him, and detained him for nearly two full days to obtain the confession. The circuit court denied his pretrial motion to suppress, and Smith was found guilty and sentenced to life. In 2022, the Illinois Appellate Court vacated Smith's conviction and remanded the case for a new trial and suppression hearing.

78.     In February 1993, Detectives Halloran, Boudreau, and other Area 1 detectives obtained a false, involuntary confession from Nick Escamilla and Tyrone Reyna to the murder of a young man named Hector Olague. Based on the false, involuntary statements obtained by Detectives Halloran and Boudreau, Reyna, Morales, and Escamilla were all convicted of murder. On October 31, 2023, their convictions were vacated, and on June 12, 2023, they were awarded Certificates of Innocence.

79.     In March 1993, Defendants Halloran and Boudreau obtained a false involuntary confession from Harold Hill to the 1990 of Kathy Morgan. To obtain Hill's confession, Halloran and Boudreau fed him details of the crime, screamed at him, grabbed him by the shoulders, punched him in the shoulders, and held him for over 26 hours. During the same investigation, detectives working with Halloran and Boudreau obtained confessions from Dan Young, a man who could not read and had an IQ of 56. Halloran and Boudreau also obtained a confession from Peter Williams, a man who was in prison on the day of the crime and therefore could not have committed it. Although Williams was not convicted, Hill and Young were convicted of murder. In 2004, post-conviction DNA testing excluded Hill and Young as perpetrators, and in 2005 their convictions were vacated.

80.     In May 1993, Defendants Halloran and Boudreau physically abused Tyrone Hood and Wayne Washington to extract false confessions to the 1993 murder of Marshall Morgan Junior. Washington yielded to the detectives' abuse confession, but Hood did not confess. Without a confession from Hood, Boudreau and Halloran worked with other Area 1 detectives to fabricate false statements from witnesses to implicate Hood in the crime. Both were convicted of first-degree murder. Decades later, after new evidence came to light pointing to the true perpetrator, the State agreed to vacate the convictions and dismiss charges. Hood and Washington were both awarded Certificates of Innocence.

81.     In April 1994, Defendants Halloran, Boudreau, Clancy, and Foley extracted false confessions from Nevest Coleman and Daryl Fulton to rape and murder. Coleman and Fulton alleged that these detectives employed sleep deprivation and physical abuse as interrogation tactics and fed him details of the crime. Coleman and Fulton were both convicted when confessions were

introduced against them at trial. In 2017, DNA evidence exonerated Coleman and Fulton, their convictions were vacated, and they were awarded Certificates of Innocence.

82. In August 1994, Defendants Halloran and Boudreau participated in coercing a false confession from David Wright. Wright alleged that Boudreau grabbed his neck, and threw him against the wall, while Halloran watched and threatened Wright with the death penalty. In 2022, the trial court held a post-conviction evidentiary hearing, including evidence of Boudreau and Halloran's pattern of misconduct, and found it more likely than not that Wright's confession was coerced. The court vacated the conviction and ordered a new suppression hearing and trial. The State subsequently dropped all charges against Wright, and he was awarded a Certificate of Innocence.

83. In June 1995, Defendants Boudreau, Halloran, and other CPD detectives coerced a false confession from Derrick Flewellen to the murders of Sherry Hunt and Lovie Ford. Flewellen alleged that Boudreau physically abused him and denied him pain medication and that he gave a false confession after nearly 36 hours in custody. Subsequent DNA testing later cleared Flewellen and implicated a serial murderer.

84. Nearly all the misconduct described above took place during a similar time frame as this case (the mid-1990s) by the same detectives in this case (primarily John Halloran and other Area 1 detectives) and involve similar allegations of physical abuse and coercive interrogation techniques, including lengthy periods detention, false promises of leniency, and deprivation of food and sleep.

## The City of Chicago's Policies and Customs Caused Plaintiff's Wrongful Conviction

85. The Chicago Police Department is responsible for scores of miscarriages of justice like those the Defendant Officers inflicted on Plaintiff by virtue of its policies and practices.

86. Since 1982, no fewer than 150 cases have come to light in which CPD officers fabricated false evidence or suppressed exculpatory evidence to convict innocent people for serious crimes they did not commit—numerous of which involve the named Defendant Officers.

87. Some Officer Defendants involved in wrongfully convicting Plaintiff had been supervised by Jon Burge, who was responsible for the torture of dozens of Chicagoans at his own hands and by the officers he supervised.

88. Over a decade before Plaintiff was framed via a coercive interrogation, the Defendant City of Chicago had notice that its detectives were terrorizing people into confessing. This practice, which began with Jon Burge and others under his watch at Area Two and then Area Three was in full force in the late 1970s, throughout the 1980s, and into the 1990s and beyond. The City learned about these practices in 1982 when Andrew Wilson and Jackie Wilson were tortured—Andrew was tortured so badly that the jail would not even take him. The City knew, or should have known, that these practices continued when Burge and other officer tortured Aaron Patterson and Eric Caine in 1986, with Patterson even etching into a bench he had been tortured.

89. The City knew, or should have known, that the coerced and fabricated confession practice extended beyond Areas Two and Three and beyond Burge and his closer associates into other parts of the City and involving other officers in the 1980s and 1990s.

90. So entrenched is this pattern and practice that an Illinois court recently prevented the State from contesting that Defendants Halloran and Boudreau had a pattern and practice of abusive misconduct in their investigations that they conducted between 1990 and 2001.

91. These cases include many in which Chicago police officers used the same tactics the Defendant Officers employed against Plaintiff in this case, including: (1) using physically

coercive tactics to obtain involuntary, false, and fabricated confessions; (2) fabricating witness statements; and (3) concealing exculpatory evidence.

92. At all times relevant hereto, members of the Chicago Police Department, including the Defendant Officers in this action, routinely manufactured evidence against innocent people by coercing, manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to obtain false statements implicating innocent people, knowing full well those statements were false. As a matter of widespread custom and practice, members of the Chicago Police Department, including the Defendant Officers in this action, contrived false narratives that were fed to vulnerable suspects and witnesses, who then adopted those false narratives as their own so police could secure the wrongful conviction of innocent people.

93. In 2019, the Federal Bureau of Investigation and Department of Justice admitted Chicago Police Department supervisor, Jon Burge—a supervisor for the Defendant Officers—was aware that on numerous occasions, detectives he was supervising participated in the torture and physical abuse of persons being questioned. One such detective was Defendant Boudreau.

94. Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured, or offered inducements to make false statements.

95. The municipal policy and practice set out in the paragraphs above was recently described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The Report documents, among other things, that Chicago police detectives fed information to witnesses and coached them through court-reported and handwritten statements, and physically abused witnesses.

96. After the Englewood Four were exonerated, the FBI discovered an insider's account of how those false confessions were obtained. Former Assistant State's Attorney Terrence Johnson revealed that detectives, including Defendants Foley and Boudreau, told the Englewood Four they could go home if they cooperated by confessing to the crime and implicating others. They were told "witnesses go home." Johnson further reported that the detectives created a "cheat sheet" to help them keep their stories straight when testifying at the subsequent motions to dismiss brought by the Englewood Four.

97. At all times relevant hereto, members of the Chicago Police Department, including the Defendant Officers in this action, systematically suppressed exculpatory and/or impeaching material by intentionally concealing discoverable reports, memos, and other information in files that were maintained solely at the police department and were not disclosed to other participants in the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of an investigation, rather than being maintained as part of the official file.

98. Consistent with the municipal policy and practice described in the preceding paragraphs, employees of the City of Chicago, including Defendant Officers, concealed exculpatory evidence from Plaintiff. On information and belief, the Defendant Officers also maintained clandestine files that were not turned over to the prosecutor and were destroyed or hidden at the close of the investigation, including, for example, documents relating to witness interviews.

99. The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of *Rivera v.*

*City of Chicago*, 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, 87 C 2536 (N.D. Ill.), among others.

100. The policy and practice of file suppression at issue in *Fields* was in place from the 1980s through the 2000s, including during the commission and investigation of the Davis homicide described above.

101. Additionally, a set of clandestine street files was found in the case of *Rivera v. City of Chicago*, 12 C 4428 (N.D. Ill.). Those files, which emanated from a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants. This means that this policy and practice was also in place during the commission and investigation of the Davis murder.

102. In addition to the problems identified above, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

103. Before and during the period in which Plaintiff was falsely charged with the Davis murder, and then later convicted of crimes related to the Davis murder, the City of Chicago operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City's Office of Professional Standards almost never imposed significant discipline against police officers accused of violating civilians' civil and constitutional rights. And the Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

104. Indeed, in a review of 98 allegations of coerced confessions or fabricated evidence, culled from complaints against officers assigned to Area 1 and lodged with OPS between 1989 and 1996, OPS did not sustain a single one of these allegations.

105. As a matter of both policy and practice, municipal policymakers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

106. The City has admitted the code of silence exists.

107. As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department, officers (including the Defendant Officers here) have come to believe that they may, without fear of adverse consequences, violate the civil rights of members of the public and cause the innocent to be charged with serious crimes. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

108. The City of Chicago and its Police Department also failed in the years before Plaintiff's wrongful charging and conviction to provide adequate training to Chicago Police Detectives and other officers in the following areas, among others: (a) The need to refrain from physical and psychological abuse of, and manipulative and coercive conduct toward, suspects and witnesses; (b) The constitutional requirement to disclose exculpatory and impeachment evidence, including how to identify such evidence and what steps to take when exculpatory and/or

impeachment evidence has been identified to ensure the evidence is part of the criminal proceeding; (c) The risks of engaging in tunnel vision during investigation; (d) The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers; and (e) the need to report misconduct committed by fellow officers. The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

109. The City's failure to train, supervise, and discipline its officers, including the Defendant Officers, condones, ratifies, and sanctions the kind of misconduct that Defendants committed against Plaintiff in this case. Constitutional violations like those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

110. The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

111. The City of Chicago's policymakers also approved the policies and practices described in the foregoing paragraphs and were deliberately indifferent to the violations of constitutional rights described herein.

112. In fact, some of the City's training encouraged abusive, unconstitutional conduct.

113. Nearly all the misconduct described above took place during a similar time frame as this case (the mid-1990s) by the same detectives in this case (primarily John Halloran and other

Area 1 detectives) and involve similar allegations of physical abuse and coercive interrogation techniques, including lengthy periods detention, food, and sleep deprivation, etc.

114. The practice of obtaining coerced and false confessions by CPD has had, for decades, a concomitant practice involving Felony Review Unit Assistant State's Attorneys ("FRU ASAs") reporting to the police station to purportedly "memorialize" statements and "confessions" allegedly voluntarily made by the suspect.

115. The FRU ASAs work alongside officers approving statements, as done here.

116. At all relevant times, the the Cook County State's Attorney's Office typically staffed the FRU with new, young prosecutors. The FRU attorneys faced pressure to go along with and approve police-generated statements because appeasing police officers could "make or break" their careers. These CPD practices caused Plaintiff harm here, including via the involvement of the ASA Sabin here.

**Plaintiff's damages**

117. For 20 years, Plaintiff was forced to live in confinement and serve out a punishment for a crime he did not commit.

118. During his time in custody, Plaintiff lived in dangerous, degrading, and dehuminzing conditions that were damaging to his physical and mental health.

119. For 20 years, Plaintiff was also denied the opportunity to live his life and develop into mature adulthood as a free person. He lost the opportunity to share life experiences with his loved ones and his ability to nurture relationships was severely limited.

120. As a result of Defendants' misconduct described in this complaint, Plaintiff suffered physical injury, psychological trauma, and severe ongoing mental anguish and emotional pain, which persists to this day.

**Count 1 – 42 U.S.C § 1983**
**Due Process Violation**
**(Fourteenth Amendment)**

121. Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

122. As described more fully above, the Defendants, while acting individually, jointly, and in conspiracy with each other, deprived Plaintiff of his constitutional right to due process and a fair trial by deliberately fabricating evidence of Plaintiff's guilt, withholding exculpatory evidence, and engaging in other as-yet unknown acts of misconduct.

123. Defendants' misconduct directly resulted in Plaintiff's unjust criminal prosecution and wrongful conviction. Absent this misconduct, Plaintiff's prosecution would not and could not have been pursued.

124. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and with total disregard for Plaintiff's rights.

125. Additionally and/or alternatively, Defendants named above failed to intervene to stop Plaintiff's wrongful prosecution and conviction despite having the opportunity to do so.

126. As a result of the misconduct described in this Count, Plaintiff suffered damages as set forth above.

127. The misconduct described in this Count by the Officer Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count 5.

**Count 2 – 42 U.S.C § 1983**
**Deprivation of Liberty without Probable Cause**
**(Fourth and Fourteenth Amendments)**

128. Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

129.    In the manner described more fully above, the Defendants individually, jointly, and in conspiracy with each other used fabricated evidence to accuse Plaintiff of criminal activity and detain him without probable cause.

130.    The Defendants accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings against Plaintiff.

131.    Statements of Defendants regarding Plaintiff's alleged culpability were made with knowledge that said statements were false. Defendants also fabricated evidence, coerced false inculpatory statements, and withheld exculpatory evidence that would have demonstrated Plaintiff's innocence, destroyed material and/or exculpatory evidence and used unduly suggestive identification procedures.

132.    Defendants intentionally withheld from and misrepresented to prosecutors facts that further vitiated probable cause against Plaintiff, as set forth above, and failed to investigate evidence which would have led to the actual perpetrator. Defendants withheld the facts of their manipulation and the resulting fabrications from Plaintiff.

133.    In so doing, the Defendant Officers caused Plaintiff to be deprived of his liberty and detained without probable cause in violation of his rights secured by the Fourth and Fourteenth Amendments.

134.    On February 24, 2025, the prosecution terminated in Plaintiff's favor when his conviction was vacated and on July 23, 2025 all charges against him were dismissed.

135.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear innocence.

136. As a result of Defendants' misconduct described in this Count, Plaintiff suffered damages as set forth above.

137. The misconduct described in this Count by the Officer Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count 5.

**Count 3 – 42 U.S.C § 1983**
**Coercive Interrogation**
**(Fifth and Fourteenth Amendments)**

138. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

139. In the manner described more fully above, the Defendants, acting individually, jointly, and in conspiracy, coercively interrogated Plaintiff and using techniques which "shock the conscience" during said interrogations, resulted in the false, coerced, and fabricated confession that was subsequently used against Plaintiff in his prosecution, and thereby violated Plaintiff's Fifth and Fourteenth Amendment rights to be free from compulsory self-incrimination and deprivation of liberty without due process of law as guaranteed by the United States Constitution.

140. As a result of the Defendants' misconduct described in this Count, Plaintiff suffered damages set forth above.

141. The misconduct described in this Count by the Officer Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count 5.

**Count 4 – 42 U.S.C §§ 1983, 1985, 1986**
**Conspiracy to Deprive Constitutional Rights**

142. Each paragraph of this Complaint is incorporated as if restated fully herein.

143. In the manner described more fully above, the Defendants agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his

constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

144. Additionally, Defendants further conspired to deprive Plaintiff of exculpatory information to which he was lawfully entitled and which would have led either to his not being charged, his acquittal, or his more timely exoneration.

145. In this manner, Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

146. In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above—such as fabricating evidence, withholding exculpatory evidence, coercing false statements, and committing perjury during hearings and trials—and was an otherwise willful participant in joint activity.

147. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's rights.

148. As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiff's rights were violated, and he suffered injuries, including but not limited to loss of liberty, psychological injury, and emotional distress.

### Count 5 – 42 U.S.C. § 1983
### Municipal Liability

149. Each paragraph of this Complaint is incorporated as if restated fully herein.

150. The actions of all the individual Defendant Officers were undertaken pursuant to policies and practices of the Department, described above, which were ratified by policymakers for the City of Chicago with final policymaking authority. These policies and practices included but were not limited to the failure to adequately train, supervise, and discipline officers who

engaged in the alleged constitutional violations, as set forth in greater detail above. These policies and practices also included a practice of coercing false confessions and fabricating evidence, particularly from young men of color to close cases as described more fully above.

151. Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that alleged here.

152. The above-described widespread practices were so well-settled as to constitute *de facto* policy of the City of Chicago and were allowed to exist and flourish because municipal policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

153. The widespread practices described in the preceding paragraphs were also allowed to flourish because the City of Chicago declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

154. Indeed, the Chicago Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that affected Plaintiff was and is, for all practical purposes, nonexistent. The Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline, or oversight.

155. Chicago police officers and other employees of the City of Chicago who manufactured criminal cases against individuals like Plaintiff had every reason to know not only

that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter what the cost. In this way, the City proximately caused abuses like the Defendant Officers' misconduct at issue in this case.

156. The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

157. The policies and practices described in this Count were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiffs' constitutional rights. The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

158. The City of Chicago is therefore liable for the misconduct committed by the Defendant Officers.

### Count 6 – State Law Claim
### Malicious Prosecution

159. Each paragraph of this Complaint is incorporated as if restated fully herein.

160. In the manner described more fully above, the Defendants accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings against Plaintiff.

161. Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

162. The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

163. On July 23, 2025, the prosecution terminated in Plaintiff's favor when his criminal charages against him were dismissed.

164. As a direct and proximate result of this misconduct, Plaintiff sustained injuries as set forth above, including psychological injury, and emotional distress.

## Count 7 – State Law Claim
## Intentional Infliction of Emotional Distress

165. Each paragraph of this Complaint is incorporated as if restated fully herein.

166. The acts and conduct of Defendants as set forth above were extreme and outrageous. Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, emotional distress to Plaintiff, as is more fully alleged above.

167. As a direct and proximate result of the Defendant' actions, Plaintiff suffered and continues to suffer emotional distress.

## Count 8 – State Law Claim
## Willful and Wanton Conduct

168. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

169. At all times relevant herein, Defendants had a duty to refrain from willful and wanton conduct in connection with their investigation.

170. As described herein, it was foreseeable to Defendants coercing a false confession, fabricating evidence, and suppressing exculpatory evidence, in addition to the other misconduct alleged above, in order to frame Plaintiff, would inevitably result in extreme harm to him.

171. Notwithstanding that duty, Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

172. Because of Defendants' misconduct, Plaintiff suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

### Count 9 – State Law Claim
### Civil Conspiracy

173. Each paragraph of this Complaint is incorporated as if restated fully herein.

174. As described more fully in the preceding paragraphs, Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

175. In furtherance of the conspiracy, Defendants committed overt acts and were otherwise willful participants in joint activity including, but not limited to, the malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

176. The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

177. As a direct and proximate result of Defendants' conspiracy, Plaintiff suffered damages, including psychological injury and emotional distress, as is more fully alleged above.

### Count 10 – State Law Claim
### *Respondeat Superior*

178. Each paragraph of this Complaint is incorporated as if restated fully herein.

179. In committing the acts alleged in the preceding paragraphs, each of the Defendant Officers were employees and agents of the City of Chicago, acting at all relevant times within the scope of their employment. Defendant City of Chicago is liable as principal for state law torts committed by its agents.

180. In committing the acts alleged in the preceding paragraphs, Defendant Sabin was an employee and agent of the Cook County State's Attorney's Office, acting at all relevant times

in the scope of his employment. Defendant Cook County State's Attorney's Office is liable as principal for state law torts committed by its agents.

## Count 11 – State Law Claim
### Indemnification Pursuant to 745 ILCS 10/9-102 and Common Law Claims Against the City and County

181.    Each paragraph of this complaint is incorporated as if restated fully herein.

182.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

183.    The Defendant Officers are or were employees of the Chicago Police Department, who acted within the scope of their employment in committing the misconduct described herein.

184.    The City of Chicago is responsible for paying any judgment entered against the Defendant Officers.

185.    Defendants Cook County and Cook County State's Attorney's Office were at certain times material to this complaint the employer of ASA Sabin. Said Defendants are therefore responsible for any judgment entered against ASA Sabin.

WHEREFORE, Plaintiff Richard Anthony respectfully requests that this Court enter judgment in his favor and against the Defendants, awarding compensatory damages, prejudgment interest, attorneys' fees, and costs against each Defendant, and punitive damages against any of the individually named Defendants, as well as any other relief this Court deems appropriate.

**Jury demand**

Plaintiff Richard Anthony hereby demands a trial by a jury pursuant to Federal Rule of

Civil Procedure 38(b) on all issues so triable.

Respectfully Submitted,

**RICHARD ANTHONY**

By: /s/ Elizabeth Mazur

Elizabeth Mazur
William Greenlaw
Hughes Socol Piers Resnick & Dym, Ltd
70 W. Madison, Suite 4000
Chicago, IL 60602
312.604.2726
emazur@hsplegal.com
wgreenlaw@hsplegal.com